## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| Typemock, LTD.,<br><br>   Plaintiff,<br><br> v.<br><br>Telerik, Inc.,<br><br>   Defendant. | Case No.: 1:17-cv-10274-RGS<br><br>**JURY TRIAL DEMANDED** |

## DEFENDANT TELERIK, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.   THE PARTIES AND THE ASSERTED PATENTS ..................................................... 1

II.  LEGAL STANDARDS ........................................................................................ 2

    1.   General Claim Construction Principles ......................................................... 2

    2.   Functional Claiming and 35 U.S.C. § 112, ¶ 6 ............................................. 3

III. ARGUMENT ..................................................................................................... 4

    1.   The Asserted Claims are Indefinite For Failing to Recite Structure Corresponding to Claimed Functions, and are Therefore Invalid Under 35 U.S.C. § 112 ............. 4

       A.   "**computational apparatus . . .** " ('923 patent, claims 1, 30; '041 patent, claim 9) ... 6

       B.   "**[8] a first processor** functionally associated with a digital memory, which digital memory stores processor executable software testing code adapted to cause **[8] one or more second processors** to" ('041 patent, claim 1) ................................................. 11

       C.   "**apparatus for adding access controlling code . . .** " / "**apparatus for modifying said meta-data . . .** " ('923 patent, claims 32, 48) .................................................... 12

       D.   "introducing, prior to execution, **[5] code elements for runtime access** of [6] application points" ('923 patent, claims 1, 30; '041 patent, claims 1, 9) ................... 13

       E.   "access controlling code external of the software application for anticipating forthcoming utilization of utilized software components by utilizing software components and for selectively preventing said utilization by controlling access of the utilizing software component to the utilized software component" ('923 patent, claims 9, 39) .......................................................................................................... 14

    2.   The Asserted Claims are Indefinite For Failing to Recite the Purported Invention with Reasonable Certainty, and are Therefore Invalid Under 35 U.S.C. § 112 ..... 15

       F.   "wherein **said set** comprises at least one utilizing software component" ('923 patent, claim 4) ............................................................................................................. 15

       G.   "[3] computational apparatus for **[4] at least partially isolating**" ('923 patent, claims 1, 18, 30; '041 patent, claims 1, 9) ........................................................................ 16

H.  "a plurality of software components, at least some of which are **[1] coupled** in a utilizing-utilized relationship" ('923 patent, claims 1, 30; '041 patent, claims 1, 9) ..17

I.  "a plurality of software components, at least some of which are [1] coupled in a **[2] utilizing-utilized relationship**" ('923 patent, claims 1, 4, 9, 26, 32, 34, 39, 48; '041 patent, claims 1, 9) .............................................................................18

J.  "introducing, prior to execution, [5] code elements for runtime access of **[6] application points**" ('923 patent, claims 1, 30; '041 patent, claims 1, 9) ................19

K.  "an associated behavior inducing message" ('923 patent, claim 18) ........................19

L.  "wherein imposing includes removing or replacing an **[7] expected behavior** of the at least one coupled software component during runtime" ('923 patent, claim 1) .........20

3.  **Telerik's Constructions of the Disputed Claim Terms Reflect the Understanding of a Person of Ordinary Skill in the Art.** ..................................................................21

M.  **"test a software application comprising a plurality of [13] software components"** ('923 patent, claims 1, 30; '041 patent, claims 1, 9) ..................................................21

N.  "at least one coupled software component which performs a given function by **[14] introducing, prior to execution,** code elements" ('923 patent, claims 1, 30; '041 patent, claims 1, 9) .............................................................................22

O.  "computational apparatus for testing the software application by **[15] imposing a fake behavior** on the at least one coupled software component" ('923 patent, claims 1, 30; '041 patent, claims 1, 9) ..................................................................23

P.  "wherein imposing includes removing or replacing an expected behavior of the at least one coupled software component **[16] during runtime**" ('923 patent, claims 1, 30; '041 patent, claims 1, 9) ..................................................................24

Q.  "at least one expectation is generating by recording an actual call" ('923 patent, claim 24) 24

R.  "without dependency injection" ('923 patent, claim 30) ..........................................25

IV. **CONCLUSION** ..............................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Augme Techs. Inc. v. Yahoo! Inc.,*
    755 F.3d 1326 (Fed. Cir. 2014) ....................................................................................9

*Chamberlain Grp., Inc. v. Techtronic Indus. Co., Ltd.,*
    No. 16-cv-06097, 2017 WL 1304559 (N.D. Ill. Apr. 7, 2017)..............................................7

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
    349 F.3d 1373 (Fed. Cir. 2003) ...................................................................................16

*Halliburton Energy Servs., Inc. v. M-I LLC,*
    514 F.3d 1244 (Fed. Cir. 2008) ...................................................................................15

*Interval Licensing LLC v. AOL, Inc.,*
    766 F.3d 1364 (Fed. Cir. 2014) ..............................................................................16, 18

*The Mass. Inst. of Tech. and Elecs. for Imaging, Inc. v. Abacus Software,*
    462 F.3d 1344 (Fed. Cir. 2006) ...................................................................................13

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
    134 S.Ct. 2120 (2014) ..............................................................................................3, 15

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,*
    521 F.3d 1351 (Fed. Cir. 2008) .....................................................................................2

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) .....................................................................................2

*Shad v. Dean Witter Reynolds, Inc.,*
    799 F.2d 525 (9th Cir. 1986) ........................................................................................2

*Sulzer Textil A.G. v. Picanol N.V.,*
    358 F.3d 1356 (Fed. Cir. 2004) ..............................................................................2, 21

*Triton Tech. of Tex., LLC v. Nintendo of Am., Inc.,*
    753 F.3d 1375 (Fed. Cir. 2014) .....................................................................................3

*Typhoon Touch Techs., Inc. v. Dell, Inc.,*
    659 F.3d 1376 (Fed. Cir. 2011) ...................................................................................11

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................................................2

*Watts v. XL Sys., Inc.*,
    232 F.3d 877 (Fed. Cir. 2000) ............................................................................................3

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ................................................................................ passim

## STATUTES

35 U.S.C. § 112 .............................................................................................................3, 4, 7, 15

35 USC § 102 ...........................................................................................................................4

## I.     THE PARTIES AND THE ASSERTED PATENTS

Plaintiff Typemock, an Israeli-based company, has asserted two related patents, U.S. Patent No. 8,352,923 (the "'923 patent," Ex. A[1]), and U.S. Patent No. 9,251,041 (the "'041 patent," Ex. B) (collectively, the "Asserted Patents"), both entitled "Method and Systems for Isolating Software Components." The two patents claim priority to a provisional patent application filed on September 25, 2006. The '923 patent issued on issued on January 8, 2013, and the '041 patent, which is a continuation of the '923 patent, issued on February 2, 2016. Both patents share a substantially identical specification.

Typemock's patents relate generally to "validating software," which is the testing of software components as they are developed or during interim stages of development. The specification notes that testing can involve "faking" objects or complete sets of APIs (Application Program Interfaces) and then validating the arguments that are passed to, for example, the fake object. '923 patent at 2:5–28. [2] The claims, in turn, recite systems that include, among other things, (1) an apparatus for at least partially isolating some aspect of the software application and (2) an apparatus for testing some aspect of the software application. *See, e.g., id.* at claim 1; *see also* Ex. C, Declaration of Alessandro Orso ("Orso Decl."), ¶ 11.

Defendant Telerik is a wholly-owned subsidiary of Massachusetts-based Progress Software. The accused product, Telerik's JustMock, is available as part of Telerik's DevCraft platform, a toolkit including .NET and JavaScript components and tools for the development and testing of modern and high-performance applications. DevCraft is available in multiple versions, each of which bundles several products together, dependent on a user's needs. Users most

---

[1] All exhibits are attached to the Declaration of James R. Anderson, filed concurrently herewith.

[2] The '041 patent is a continuation of the '923 patent, and the specifications are substantially identical. Where appropriate, *e.g.*, where a claim term is in both patents, citations to portions of one of the Asserted Patents should be interpreted to incorporate corresponding portions of the other Asserted Patent.

commonly receive access to Telerik's JustMock product along with purchase of a DevCraft bundle.

JustMock is a fully-featured mocking framework that is designed to permit fast and flexible unit testing with private mocking capabilities. JustMock provides a single easy-to-use API, which presents a user with only those options that are relevant in the current mocking context and allows for natural expression of mocking concepts. JustMock's intuitive user interface makes mocking easy even for beginners.

## II.   LEGAL STANDARDS

### 1.   General Claim Construction Principles

A patentee's right to exclude others from practicing its invention is limited by the scope of the patent's claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The purpose of the claim construction process, then, is to establish the meaning and scope of the asserted claims before the case is sent to the jury. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). In so doing, the Court provides the jury with guidance on the meanings of the disputed claim terms so that it "will be able to 'intelligently determine the questions presented'" during the trial. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004)(quoting *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 532 (9th Cir. 1986)).

The intrinsic record is the touchstone for any claim construction dispute. *Phillips*, 415 F.3d at 1313–14 (Fed. Cir. 2005). The specification, of which the claims are a part, "is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). While courts are permitted to refer to extrinsic evidence, such as expert testimony, such evidence is "less significant than the intrinsic record." *Phillips*, 415 F.3d at 1317.

2

Where a claim does not particularly point out and distinctly claim the subject matter that the applicant regards as his or her invention, the claim is indefinite. 35 U.S.C. § 112, ¶ 2. A claim is indefinite where a person of ordinary skill in the art would not be informed about the scope of the invention with reasonable certainty. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

### 2.   Functional Claiming and 35 U.S.C. § 112, ¶ 6

A patentee is permitted to stake the bounds of his invention using what is known as "means-plus-function" claiming:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. "In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function." *Triton Tech. of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014). While a patentee's choice to use a word other than "means" creates a rebuttable presumption that § 112, ¶ 6 does not apply, claims reciting function by using "nonce words," such as "module," "mechanism," and "device," also rarely connote definite structure and should generally be afforded means-plus-function treatment. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015) (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).

When construing a means-plus-function term, the court must: (1) "identify the claimed function," then (2) "determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 792 F.3d at 1351. If multiple functions are claimed, the patentee must have described adequate structure for each function. *Id.* at 1351–52. And, if

adequate corresponding structure to achieve the corresponding claimed function is not disclosed in such a manner that would be understandable to a person of ordinary skill in the art, the means-plus-function term is indefinite.  *Id.* at 1352.

## III.   ARGUMENT

Although Plaintiff Typemock is expected to argue that its patents are broad, it in fact did not invent validating software. More importantly, by the time Typemock filed the provisional application to which its two patents claim priority, Typemock had been selling products using the patented technology for over a year, including at least one sale on August 3, 2005 to a company based in the United States. Those sales invalidate its patents. Indeed, after Telerik pointed those early sales out to Typemock early in this case, Typemock dropped the independent claims from this case.[3]

While Typemock has dropped all of the independent claims from the case, the remaining dependent claims are all based on those invalid independent claims, which continue to form the bases of Typemock's infringement case. As a result, many of the claim terms that require construction are found within the independent claims.

### 1.   The Asserted Claims are Indefinite For Failing to Recite Structure Corresponding to Claimed Functions, and are Therefore Invalid Under 35 U.S.C. § 112.

The asserted claims are indefinite, and therefore invalid, because they do not provide reasonable certainty as to the scope of the claims. Specifically, with reference to exemplary claim 1 of the '923 patent and exemplary claim 1 of the '041 patent, the following bolded terms are indefinite:[4]

---

[3] Telerik will be moving for summary judgment of invalidity under 35 USC § 102, with respect to the asserted claims, after the claim construction process and confirmatory discovery.

[4] Common terms in both patent claims are given the same [bracketed number], for ease in following the arguments in the brief, below.

### *'923 Patent, Claim 1*

A software testing system operative to test a software application comprising a plurality of software components, at least some of which are **[1] coupled** in a **[2] utilizing-utilized relationship** the system comprising:

a processor and memory:

**[3] computational apparatus for [4] at least partially isolating**, from within the software application, at least one coupled software component which performs a given function by introducing, prior to execution, **[5] code elements for runtime access** of **[6] application points** associated with the at least one coupled software component, wherein at least one code element associated with the at least one coupled software component provides access control between utilizing-utilized software components;

**[3] computational apparatus for testing** the software application by imposing a fake behavior on the at least one coupled software component, wherein imposing includes removing or replacing an **[7] expected behavior** of the at least one coupled software component during runtime; and wherein the at least one code element is operative to query said computational apparatus for testing.

### *'041 Patent, Claim 1*

A system for providing testing for a given software application comprising a plurality of software components, at least some of which are **[1] coupled**, said system comprising:

**[8] a first processor** functionally associated with a digital memory, which digital memory stores processor executable software testing code adapted to cause **[8] one or more second processors** to:

**[4] at least partially isolate** from within the given software application, during runtime, at least one coupled software component which performs a given function by introducing, prior to execution of the software application, **[5] code elements for runtime access** of **[6] application points** associated with the at least one coupled component of the given software application, such that at least one of the introduced code elements provides the software testing code access between **[2] utilizing-utilized software components** during runtime; and

test, by use of the second processors running the testing code, the given software application by imposing a fake behavior on the at least one coupled software component, wherein imposing behavior includes removing or replacing an expected behavior of the at least one coupled software component, during runtime, by use of the access provided by the at least one of the introduced code elements.

The terms discussed in Section III.1.A–E below are what is known as "means-plus-function" terms, as they recite only "nonce" terms—terms that do not describe definite structure—that perform specified functions. The terms render the claim invalid as indefinite, because the patent fails to disclose any *structure* that corresponds to the recited functions.

A.      **"computational apparatus . . ."** ('923 patent, claims 1, 30; '041 patent, claim 9)[5]

The term "computational apparatus" is the cornerstone of independent claims 1 and 30 of the '923 patent and independent claim 9 of the '041 patent. Those claims, and many of the claims that depend from them, are written as a series of functions (identified in the footnote below[6]) that are performed by one or another associated "computational apparatus" "*for*" performing those functions.  Orso Decl. ¶ 13.

"Computational apparatus" is a classic "nonce" term, as "[t]he word 'apparatus' does not provide any indication of structure 'because it sets forth the same black box recitation of structure for providing the same specified function as if the term "means" had been used.'"

---

[5] Citation to particular claims in section headings is intended to be for reference purposes only, and generally refers to the first occurrence of the claim term being discussed.  For the avoidance of doubt, where, for example, a claim term first appears in an independent claim and appears later in dependent claims, Telerik's contention is that the term should be afforded the same construction.

[6] *"computational apparatus for at least partially isolating . . . "*
'923 patent, claims 1, 30: "at least partially isolating, from within the software application, at least one coupled software component which performs a given function by introducing, prior to execution, code elements"
*"computational apparatus for testing . . . "*
'923 patent, claim 1: "testing the software application by imposing a fake behavior on the at least one coupled software component, wherein imposing includes removing or replacing an expected behavior of the at least one coupled software component during runtime"
'923 patent, claim 30 "testing the software application by removing or replacing a behavior of at least said at least partially isolated coupled software component during runtime, without dependency injection, wherein said apparatus for testing is operative to generate a plurality of expectations each of which comprises an identity of an individual component from among the plurality of software components and an associated behavior inducing message inducing said apparatus for at least partially isolating, when said individual component is called, to selectively at least partially isolate, and to impose a fake behavior upon, the individual component"
*"computational apparatus . . . "*
'041 patent, claim 9: [A] "at least partially isolating from within the software application . . . running a testing application, during runtime at least one coupled software component which performs a given function by introducing into the software application, code elements" [and] [B] "testing . . . the software application by imposing a fake behavior on the at least one coupled software component, wherein imposing behavior includes removing or replacing an expected behavior of the at least one coupled software component, during runtime, by use of the access provided by the at least one of the introduced code elements"

*Chamberlain Grp., Inc. v. Techtronic Indus. Co., Ltd.*, No. 16-cv-06097, 2017 WL 1304559, at *23 (N.D. Ill. Apr. 7, 2017) (quoting *Williamson*, 792 F.3d at 148–49). Because the claims recite a function tied only to this "nonce" term, they require construction as a "means plus function" term under 35 U.S.C. § 112.

The first step in construing a means-plus-function term is identification of the claimed function. *Williamson*, 792 F.3d at 1351. Each independent claim of the '923 patent requires two *separate* computational apparatuses, one for, as recited in footnote 5, above, "at least partially isolating" and a second for, among other things, "testing the software application." Orso Decl. ¶ 13. The dependent claims add additional functions that are to be performed by either the "computational apparatus for at least partially isolating" or the "computational apparatus for testing," and any identified structure must also be associated, to a person of ordinary skill int eha rt, with those functions in the dependent claims as well. *Compare, e.g.*, '923 patent claim 10 *with* claim 18. In addition, the claims of the '923 patent also recite, as separate components, a processor and memory, which the claim language does not tie to either of the two recited "computational apparatus[es]."

The '041 patent also uses means-plus-function "computational apparatus" language, but in contrast to the term's use in the '923 patent, refers to only a single "computational apparatus." The result is that claim 9 of the '041 patent recites functions including "at least partially isolating . . . " and "testing . . . the software application . . .," both of which must be performed by the *single* claimed "computational apparatus." Orso Decl. ¶ 13.

The second step in construing means-plus-function terms is to determine what structure, if any, is disclosed in the specification that corresponds to the functions recited in the claims. The "computational apparatus" terms fail this step, and are indefinite because the specification

does not tie the myriad functions recited for each "computational apparatus" term to any *structural* component, let alone explain how any specific structural component disclosed in the patent performs the recited functions (Orso Decl. ¶ 14–15), as required by the second step of construing means-plus-function terms as articulated in *Williamson*. 792 F.3d at 1351.

The term "computational apparatus" does not appear in the specification at all. Outside of the claims and abstract, the more general term, "apparatus," appears on its own in the specification just four times, and the description for "apparatus" highlights the total lack of definite structure. In the Summary of the Invention, the patentee provided that

> The **apparatus of the present invention may include**, according to certain embodiments of the invention, **machine readable memory containing or otherwise storing a program of instructions which, when executed by the machine, implements some or all of the apparatus, methods, features and functionalities** of the invention shown and described herein. Alternatively or in addition, the **apparatus of the present invention may include**, according to certain embodiments of the invention, **a program as above which may be written** in any conventional programming language, and optionally a machine for executing the program such as but not limited to a general purpose computer which may optionally be configured or activated in accordance with the teachings of the present invention.

'923 patent at 3:19–32 (emphasis added). That description says no more than that a computer can perform the *functions* described in the specifications, but does not provide any physical structure that would be capable of performing those functions.

The extensive functions laid out in the claims that are performed by the "computational apparatus" suggest that the "computational apparatus" must be more than a general purpose computer. But, *at most,* the specification describes only a general purpose computer that "may be" programmed to execute the disclosed functions. That does not rise to the level of sufficiently definite structure. *See Williamson*, 792 F.3d at 1352 ("[T]his court has consistently required that

the structure disclosed in the specification be more than simply a general purpose computer or microprocessor"); Orso Decl. ¶ 14–15.

The only other instance of "apparatus" in the specification confirms that the patentee did nothing more than recite function without adequate supporting structure. The specification states that "FIG. 8 is a simplified flow diagram of a mocked method flow which may be performed by the *apparatus* of FIG. 1, in accordance with certain embodiments of the present invention." '923 patent at 3:64–67 (emphasis added). In other words, Figure 8 depicts the *function* that can be performed by the purported "apparatus" shown in Figure 1. But, the description of Figure 1 confirms that it is "a simplified *functional block diagram* of a software isolation system constructed and operating in accordance with certain embodiments of the present invention." *Id.* at 3:43–45 (emphasis added). And, reference to Figure 1 shows that it is nothing more than a collection of "black boxes," which do not connote sufficiently definite structure. *See Augme Techs. Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1338 (Fed. Cir. 2014) (finding that disclosure of a "black box" for performance of the recited function did not describe sufficiently definite structure).

The prosecution history of the '923 patent confirms that the "computational apparatus" cannot be merely computer code, but rather must be tied to *physical* structure. The Examiner rejected an early version of the claim terms reciting just "apparatus," because

> Such an 'apparatus' is discussed in the specification on page 4 lines 23–25 [of the specification as-filed] *as being a program, or software per se*. A claim that covers both statutory and non-statutory embodiments . . . embraces subject matter that is **not eligible for patent protection** and therefore is directed to non-statutory subject matter. In contrast, such a 'system' stored on a non-transitory computer readable medium would be considered to be statutory.

Ex. D at 3 (emphasis added); *see also* Ex. G, Specification as-filed at 4:23–25, corresponding to '923 patent at 3:16–19, cited above ("Alternatively or in addition, the apparatus of the present invention may include, according to certain embodiments of the invention, *a program* as above which may be written in any conventional programming language . . . .") (emphasis added). The Applicant did not dispute that characterization and amended the claims to recite a "computational apparatus" as something that purports to connote physical structure, in order to overcome the Examiner's § 101 rejection under prevailing law at the time. *See* Ex. H, Amendment, App. No. 12/442,948 (Apr. 30, 2012), at 3, 16–17.

The Examiner interpreted the "apparatus" terms as requiring physical structure throughout prosecution—a characterization that the Applicant never disputed. For example, in comparing the claims to the prior art, the Examiner noted that "the 'apparatus' is interpreted *not* as a 'program' as described on page 4 lines 23–25 of the specification [as-filed], but as [prior art reference] Avakian's server (see paragraph [0054]), *i.e. a 'machine' as described on page 4 lines 25–26*." Ex. D at 7 (emphasis added); *see also* Ex. G at 4:23–26 ("[T]he apparatus of the present invention may include, according to certain embodiments of the invention . . . optionally *a machine* for executing the program such as but not limited to a general purpose computer which may optionally be configured or activated in accordance with the teachings of the present invention.") (emphasis added).

Referring back to the specification here, in view of the prosecution history, a person of ordinary skill in the art would not recognize any such structure that is associated with the different specific functions recited in the claims. Orso Decl. ¶ 14–15. Because a person of ordinary skill in the art would not be able to identify corresponding structure and, as a result, be

unable to understand the scope of the claim, with any reasonable clarity. the claims are indefinite.

B.     "**[8] a first processor** functionally associated with a digital memory, which digital memory stores processor executable software testing code adapted to cause **[8] one or more second processors** to" ('041 patent, claim 1)

Like the "computational apparatus" terms, the patentee describes a first "processor" that performs a number of functions, and "one or more" separate second "processors" that perform a number of different functions.[7] Typemock has indicated that it will provide no construction for this term.

Where a patentee claims a processor for performing given functions, those functions must actually be performed by the processor. *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) (finding that a claimed "processor for executing . . . " requires that the recited function be performed). It is not enough that the disclosure might disclose some general purpose processor, without both tying that processor to the specific functions to be performed and describing *how* the processor performs those functions. *Williamson*, 792 F.3d at 1352 ("[T]his court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor").

---

[7] first processor: "associate with a digital memory, which digital memory stores processor executable software testing code adapted to cause one or more second processors to [perform recited functions]"
one or more second processors: "at least partially isolate from within the given software application, during runtime, at least one coupled software component which performs a given function by introducing, prior to execution of the software application, code elements for runtime access of application points associated with the at least one coupled component of the given software application, such that at least one of the introduced code elements provides the software testing code access between utilizing-utilized software components during runtime; and test, by the given software application by imposing a fake behavior on the at least one coupled software component, wherein imposing behavior includes removing or replacing an expected behavior of the at least one coupled software component, during runtime, by use of the access provided by the at least one of the introduced code elements"

As with the "computational apparatus" terms, nothing in the specification ties those functions to any structure, let alone separate structures—one for the "first processor" and others for the "one or more second structures."[8]  Orso Decl., ¶ 16–17.  Moreover, during prosecution of the '041 patent, the Applicant amended what would become claim 1 to recite both a "first processor" and "one or more second processors," in order to overcome objections from the Examiner.  Ex. I, Amendment Under the After Final Consideration Pilot Program, App. No. 13/706,711 (Aug. 23, 2015), at 2.  Explaining its amendments, the Applicant noted that "pending independent claim 21 [issued claim 1] mirrors the subject matter of allowed claim 45 [issued claim 9], in the form of a processor + digital memory including code for causing other processors to act upon a given code under test."  Ex. I at 11.  In other words, the Applicant conceded both that the terms required means-plus-function treatment and that they connoted physical structure.  Because the specificatino does not tie such function to each of the processors recited in the claims in a way that would be reasonably clear to a person of ordinary skill in the art, claim 1 of the '041 patent is indefinite.   Orso Decl., ¶ 16–17.

C.     **"apparatus for adding access controlling code . . ."** / **"apparatus for modifying said meta-data . . ."** ('923 patent, claims 32, 48)

Asserted dependent claims of the '923 patent recite additional "apparatus[es]" that a person of ordinary skill in the art would be unable to associate with any structural disclosure in the specification.   In claims 32 and 48, the "apparatus for at least partially isolating," discussed above, comprises a further, different, "apparatus," which performs different functions recited in

---

[8] Though it refused to provide its positions throughout the claim construction process, Typemock indicated, one hour before briefing was due, that it agreed with Telerik's preliminarily proposed construction for "first processor" and "one or more second processors," which required that the processors be "separate and distinct" from one another.  Even with that agreement, the claim still requires means-plus-function treatment and is indefinite, for reciting function untethered to adequately disclosed structure for performing those functions.

the dependent claims, as set out in the footnote below.[9] Typemock has indicated that it will provide no construction.

With respect to claim 32, the '923 patent specification does not recite sufficient structure associated with "access controlling code." "Access controlling code" is not a term used in the specification, and the specification provides no other sufficient guidance from which a person of ordinary skill in the art could understand what structural disclosure, if any, to associate with the claimed "apparatus" that inserts "access controlling code between each pair of utilizing-utilized software components." Orso Decl., ¶ 18–19. The lack of sufficiently disclosed structure provides an independent reason to find claim 32 of the '923 patent indefinite.

For substantially the same reasons, claim 48 is indefinite for reciting the nonce term "apparatus" without the specification disclosing any structure associated with the claimed function. The specification fails to disclose sufficient structure for the "apparatus for at least partially isolating," but also fails to disclose sufficient structure for this additional "apparatus for modifying said meta-data." Orso Decl., ¶ 18–19. Claim 48 is therefore indefinite for this independent reason.

D.    "introducing, prior to execution, **[5] code elements for runtime access** of [6] application points" ('923 patent, claims 1, 30; '041 patent, claims 1, 9)

The "code elements" terms require means-plus-function treatment, because "element" is a classic "nonce" term that is generic in nature and that "typically do[es] not connote sufficiently definite structure." *The Mass. Inst. of Tech. and Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006). Typemock states that the term needs no construction.

---

[9] *apparatus for adding access controlling code . . . "*
"adding access controlling code between each pair of utilizing-utilized software components"

*"apparatus for modifying said meta-data . . . "*
"modifying said meta-data to point to access control code"

That the Applicant added the word "code" does nothing to provide a person of ordinary skill in the art with any reasonable certainty as to specific structure. The specification therefore must disclose structure to perform the several different functions recited in the claims, which differ between the different claims in which the term appears, as identified in detail in the footnote below.[10]  Orso Decl., ¶ 20.

The specification contains no reference to "code elements," and no disclosure by which a person of ordinary skill in the art could connect the recited functions with structure disclosed in the specification with reasonable certainty.  Orso Decl., ¶ 20.  Because the term appears in all of the asserted claims, all of the asserted claims are indefinite.

E.     "access controlling code external of the software application for anticipating forthcoming utilization of utilized software components by utilizing software components and for selectively preventing said utilization by controlling access of the utilizing software component to the utilized software component" ('923 patent, claims 9, 39)

Claims 9 and 39 of the '923 patent also require means-plus-function treatment, again for reciting black box nonce "structure" that purports to be "for" performing several different functions.  Exemplary claim 9 recites:

9. A system according to claim 1 wherein the plurality of software components comprises a set of at least one pairs of utilizing-utilized software components each including a utilized software component

---

[10] '923 patent, claim 1: "runtime access of application points associated with the at least one coupled software component, wherein at least one code element associated with the at least one coupled software component provides access control between utilizing-utilized software components"

'923 patent, claim 30: "runtime access and control of application points associated with the at least one coupled software component"

'041 patent, claim 1: "runtime access of application points associated with the at least one coupled component of the given software application, such that at least one of the introduced code elements provides the software testing code access between utilizing-utilized software components during runtime"

'041 patent, claim 9: "runtime access of application points associated with the at least one coupled software component, such that at least one of the introduced code elements provides the testing application access between utilizing-utilized software components during runtime"

and a utilizing software component which utilizes said utilized software component, and wherein said apparatus for at least partially isolating comprises **access controlling code external of the software application** *for* **[A] anticipating forthcoming utilization of utilized software components by utilizing software components and** *for* **[B] selectively preventing said utilization by controlling access of the utilizing software component to the utilized software component**.

The term "access controlling code," the "structure" identified in the claim, does not appear in the specification at all. In spite of that, Typemock contends that no construction is necessary.

The specification does not provide sufficient description to link the functions of "anticipating forthcoming utilization of utilized software components by utilizing software components" and "selectively preventing said utilization by controlling access of the utilizing software component to the utilized software component" to any disclosed structure that could be identified by a person of ordinary skill in the art, so the claims are indefinite. Orso Decl., ¶ 21–22.

## 2. The Asserted Claims are Indefinite For Failing to Recite the Purported Invention with Reasonable Certainty, and are Therefore Invalid Under 35 U.S.C. § 112.

The terms discussed in Section III.2.A–G below are also indefinite, because the patent does not explain the meaning of the term in such a way that provides a person of ordinary skill in the art with reasonable certainty as to the scope of the claim. *See Nautilus,* 134 S.Ct. at 2129.

F.       "wherein **said set** comprises at least one utilizing software component" ('923 patent, claim 4)

| Telerik's Construction | Plaintiff's Construction |
|---|---|
| Indefinite (no antecedent basis) | the set of components that are 'coupled in a utilizing-utilized relationship' as recited in claim 1 |

A claim is indefinite where a term lacks proper antecedent basis, and such basis is not reasonably ascertainable by a person of ordinary skill in the art. *Halliburton Energy Servs., Inc.*

*v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  Here, claim 4 depends from claim 1, but claim 1 does not recite any "set" at all.  *Compare* '923 patent claim 1 *with* claim 4.  Claim 1 recites numerous elements, and nothing about the language of claims 1 or 4 would indicate to a person of ordinary skill in the art what element or elements of claim 1 "said set" was intended to refer back to.  Orso Decl., ¶ 23–24.  As a result, claim 4 is indefinite.

Typemock contends that "said set" refers to "the set of components that are 'coupled in a utilizing-utilized relationship' as recited in claim 1," but the claim language nor the specification supports such a construction.  Orso Decl., ¶ 25.  To the contrary, claim 1 recites "a ***plurality*** of software components, ***at least some of which*** are coupled in a utilizing-utilized relationship." (emphasis added).  Claim 1 provides no indication which of the "plurality of" or "at least some of" software components the "set" in claim 4 refers to.

G.  "[3] computational apparatus for **[4] at least partially isolating**"[11] ('923 patent, claims 1, 18, 30; '041 patent, claims 1, 9)

Neither the claims, nor the specification, provide any reasonable measure by which a person of ordinary skill in the art could understand the meaning behind the terms of degree captured in the phrase "at least partially isolating."  Orso Decl., ¶ 26.  The patent must contain some objective baseline by which a term of degree used in the claim language can be interpreted. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371–73 (Fed. Cir. 2014).  Again, Typemock's counsel has informed Telerik that these terms need no construction (and it has offered none), because a jury would understand the words.

"At least partially" combines two different terms of degree, "at least" and "partially." Outside of the abstract, the term "at least" is not defined in the specification at all.  "Partially" also does not appear in the specification.  Without support, a person of ordinary skill is left with

---

[11] Also, "at least partially isolate" / "selectively at least partially isolate."

the claim language itself, which is no guide to the claim's scope. Considering claim 1 for example, the claim recites a "computational apparatus for *at least partially isolating*, from within the software application, *at least one coupled software component . . . .*" '923 patent, claim 1. In other words, "at least one coupled software component" must be "at least partially isolate[ed]." Nothing in the remainder of the claim explains what "at least partially isolating" *means*. Without that guidance, a person of ordinary skill in the art would not understand, with reasonable certainty, the scope of the claim (Orso Decl., ¶ 26), and it is indefinite. *See, e.g., Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (finding that a claim term is indefinite where an accused product "might or might not infringe depending on its usage in changing circumstances.").

Claim 30 of the '923 patent adds an additional term of degree, reciting "selectively at least partially isolate." As with "at least partially isolate," the claims offer no explanation and the specification is silent on any objective bounds for "selectively," providing an independent basis for finding that claim indefinite. Orso Decl., ¶ 26.

H.    "a plurality of software components, at least some of which are **[1] coupled** in a utilizing-utilized relationship" ('923 patent, claims 1, 30; '041 patent, claims 1, 9)

The specification lacks disclosure to explain the scope encompassed by "software components" that are "coupled," as recited in the claim. Orso Decl., ¶ 27. The word "coupled" does not even appear in the specification outside of the abstract, which provides no other hint as to what the word is supposed to mean. Moreover, Typemock has indicated it does not intend to provide any explanation for the term, telling Telerik the word just means what it says.

During prosecution of the '923 patent, the Examiner rejected the claims as being indefinite where they referred to "highly coupled," because the term was not "particularly described in the originally filed specification," and noted that "the term is a relative term which

17

hinders a determination of the proper scope." Ex. D, Non-final Office Action, App. No.

12/442,948 (Nov. 28, 2011), at 4. Although the Examiner focused on the term "highly coupled",

in the context of computer programming, "coupled" itself is a term of degree, which describes

"the ***manner and degree of interdependence*** between software modules." *See* Ex. E,

ISO/IEC/IEEE 24765:2010(en) (Systems and Software Engineering – Vocabulary), at 3.657

(defining "coupling" in the context of systems and software engineering) (emphasis added);[12] *see*

*also* Ex. F, IEEE 100: The Authoritative Dictionary of IEEE Standards Terms – "coupling" (7th

ed. 2000) (same); Orso Decl. ¶ 28.

Where the claim language uses terms of degree, the specification must provide some

objective baseline by which a person of ordinary skill in the art can interpret the scope

contemplated by the term of degree. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364,

1371–73 (Fed. Cir. 2014). Because the specification here does not provide sufficient objective

bounds by which to understand what it means for components to be "coupled," including to what

degree they are "coupled"—the specification doesn't use the term at all—the asserted

independent claims are indefinite.   Orso Decl. ¶ 27–28.

I.      "a plurality of software components, at least some of which are [1] coupled in a
        **[2] utilizing-utilized relationship**"[13] ('923 patent, claims 1, 4, 9, 26, 32, 34, 39,
        48; '041 patent, claims 1, 9)

"Utilizing," "utilized," and "utilizing-utilized" are not terms with any specialized

meaning in the software field, and the specification contains no guidance by which a person of

ordinary skill in the art could understand their meaning with reasonable certainty.   Typemock

contends that the terms require no construction.

---

[12] *Available at* https://www.iso.org/obp/ui/en/#iso:std:iso-iec-ieee:24765:ed-1:v1:en.

[13] Also, "utilizing software component" / "utilized software component" / "utilizing-utilized
software components."

Recitation of "utilizing-utilized" elements does not describe the scope of the invention to a person of ordinary skill in the art with reasonable clarity. Orso Decl. ¶ 29. The terms "utilizing," "utilized," and "utilizing-utilized" do not appear in the specification at all. The term "utilizes" appears but once in the specification, in an entirely different context than the term is used in the claim. '923 patent at 1:44–46 ("In order to isolate the components, there is a need to design the program that utilizes the software components in such a way that the components can be changed.").

Without more specific definition—and none is provided in the record—a person of ordinary skill in the art is left unable to determine what parts of an accused product can be identified as being in a "utilizing-utilized relationship," or be identified individually as "utilized" or "utilizing." Orso Decl. ¶ 30.

J.    "introducing, prior to execution, [5] code elements for runtime access of **[6] application points**" ('923 patent, claims 1, 30; '041 patent, claims 1, 9)

The claims and specification fail to provide bounds on the meaning of the term "application points" that can be understood by a person of ordinary skill in the art. Orso Decl., ¶ 31. Once again, Typemock has stated that it intends to provide no construction for the term.

The claims require that the "application points" be "associated with" a software component (*see*, *e.g.*, '923 patent at claim 1), but never explain what an "application point" is. The specification fairs no better, as the term is not used there, nor is there any disclosure by which a person of ordinary skill in the art could understand the term. Because "application points" is not a term of art and is undefined in the specification, the asserted independent claims are indefinite. Orso Decl., ¶ 31.

K.    "**an associated behavior inducing message**" ('923 patent, claim 18)

Claim 18 recites:

19

18. A system according to claim 1 wherein said apparatus for testing is operative to generate a plurality of expectations each of which comprises an identity of an individual component from among the plurality of software components and ***an associated behavior inducing message*** inducing said apparatus for at least partially isolating, when said individual component is called, to selectively at least partially isolate, and to impose a fake behavior upon, the individual component.

The patent provides no disclosure from which a person of ordinary skill in the art would understand the bounds of "an associated behavior inducing message." Yet, Typemock informed Telerik that no construction is necessary.

The only reference to any "messages" at all is with reference to the ability of the "mock framework['s]" ability to send messages to the "tracer." '923 patent at 8:39–40 ("FIG. 9 show the Mock framework 110 sending messages to the tracer 112 process."). But, "[t]he tracer 112 is typically used to debug and graphically display the methods that are mocked," as opposed to performing any type of function that would be understood by a person of ordinary skill in the art to induce behavior, which is further described in claim 18. '923 patent at 4:32–33. Without any guidance from the claims or specification, a person of ordinary skill in the art would be unable to understand the scope of "an associated behavior inducing message," especially where the specification's only reference to "messages" is contrary to the way that term is used in the claim. Orso Decl., ¶ 32.

L.  "wherein imposing includes removing or replacing an **[7] expected behavior** of the at least one coupled software component during runtime" ('923 patent, claim 1)

The claims and specification do not explain to a person of ordinary skill in the art what an "expected behavior" is, as the term is used in the claim 1 of the '923 patent. Again, Typemock states that it will provide no construction for this term.

Claim 1 of the '923 patent recites, *inter alia*, "removing or replacing an *expected behavior* of the at least one coupled software component during runtime." The specification

does not describe what it means for a "coupled software component" to have an "expected behavior." Without sufficient guidance from the specification, a person of ordinary skill in the art would not understand the scope of the claim language, and the claim should be found indefinite. Orso Decl., ¶ 33.

### 3. Telerik's Constructions of the Disputed Claim Terms Reflect the Understanding of a Person of Ordinary Skill in the Art.

Telerik has identified other terms appearing in the dependent claims and the independent claims from which the asserted claims depend that should be construed in order to aid the jury in intelligently answering the questions it will be asked to consider during trial. *Sulzer Textil A.G.*, 358 F.3d at 1366. Typemock, for its part, again merely contends that each of the terms requires no construction at all, and has stated it intends to offer no alternative construction.

With reference to exemplary independent claim 1, those terms appearing in the independent claims include:

*'923 Patent, Claim 1*

A software testing system operative to test a software application comprising a plurality of **[13] software components**, at least some of which are coupled in a utilizing-utilized relationship the system comprising:
a processor and memory:
computational apparatus for at least partially isolating, from within the software application, at least one coupled software component which performs a given function by **[14] introducing, prior to execution**, code elements for runtime access of application points associated with the at least one coupled software component, wherein at least one code element associated with the at least one coupled software component provides access control between utilizing-utilized software components;
computational apparatus for testing the software application by **[15] imposing a fake behavior** on the at least one coupled software component, wherein imposing includes removing or replacing an expected behavior of the at least one coupled software component **[16] during runtime**; and wherein the at least one code element is operative to query said computational apparatus for testing.

M.  "test a software application comprising a plurality of **[13] software components**" ('923 patent, claims 1, 30; '041 patent, claims 1, 9)

"Software components" are "discrete portions of the production code capable of being isolated and changed." They play a central role in the Applicant's purported invention. The claims themselves do not provide sufficient context by which a person of ordinary skill in the art could understand the scope of the term.

The specification, in summarizing the invention, explains how "software components" is used in the context of these patents. First, the software components must be capable of being isolated. '923 patent at 1:47–51 ("Testing isolated software components gives better testing results as the coverage of the tests is much higher and the complexity does not grow exponentially."). Second, the isolated components must be capable of being changed. '923 patent at 1:52–54 ("In order to isolate the components, there is a need to design the program that utilizes the software components in such a way that the components can be changed.") In describing the purported invention, the specification goes on to explain exactly what it is that is "isolated" and "changed"—the production code. '923 patent at 4:23–27 ("The production code base 106 is the code that is to be isolated. . . . The test code 108 calls the Mock framework 110 in order to change the behavior of the production code."). Orso Decl., ¶ 34. In this software-heavy case, Telerik's proposed construction explains to the jury the bounds of the term software components, as it would be understood by a person of ordinary skill in the art in a manner consistent with the claims and specification.

N.      "at least one coupled software component which performs a given function by **[14] introducing, prior to execution,** code elements" [14] ('923 patent, claims 1, 30; '041 patent, claims 1, 9)

"Introducing, prior to execution" means "inserting into production code, before the software application is run." The claims themselves define the purported invention in part with

---

[14]  Also, "introducing, prior to execution of the software application" / "introducing into the software application, prior to execution of the software application."

reference to two conditions, events that occur before the software application is run ("prior to execution") and events that occur while the software application is being run ("during runtime"). *See, e.g.*, '923 patent, claim 1. The specification provides further support, noting that:

> There are several ways in which it is possible to **insert code 107 into production code 106** such as but not limited to the following: (a) Change the executable on disk **before** running the tests, (b) Use System IO Hooks to change the executable just **before** reading it from the disk, (c) Use function hooking techniques, (d) Use RunTime ClassLoader hooks to change the code **before** it is run, and (e) Use Profiler and Debug API's to change the code 302 **before** it is loaded as indicated by arrow 306 in FIGS. 3-4.

'923 patent at 4:36–49 (emphasis added). This disclosure summarizes the only methods that are taught in the specification that would be understood by a person of ordinary skill in the art to correspond to the "introducing . . . " term, and each of them involves insertion into production code *before* the software application is run. Orso Decl., ¶ 35.

O. "computational apparatus for testing the software application by **[15] imposing a fake behavior** on the at least one coupled software component"[15] ('923 patent, claims 1, 30; '041 patent, claims 1, 9)

"Imposing a fake behavior" means "causing, during runtime, a change from the normal operation of the at least one software component." Typemock's construction explains the meaning of the claim term as it would be understood by a person of ordinary skill in the art in a manner that would be helpful to the jury in evaluating infringement and finds support in the language of the claim itself. "Imposing a fake behavior," as recited, occurs when the software application is under test, which is only ever described as occurring "during runtime" of the software application. *See, e.g.*, '923 patent, claim 1; Orso Decl., ¶ 36. Telerik's construction is thus consistent with the claim language and would be helpful to the jury in evaluating infringement.

---

[15] Also, "impose a fake behavior."

P.   "wherein imposing includes removing or replacing an expected behavior of the at least one coupled software component **[16] during runtime**" ('923 patent, claims 1, 30; '041 patent, claims 1, 9)

"During runtime" means "while the software application is running."  It is important to connect the term "during runtime" to the specific part of the claim it is referring to in order to help the jury evaluate infringement, especially since the claims at issue are lengthy and require many different computer-related elements.  Here, while "during runtime" is not referred to in the specification directly, the specification explains what is happening in the claimed system "during runtime."  The specification does refer to "run time system 102," explaining that it is the system that actually runs the code and the tests, which "could be an operating system, a scripting system or a virtual machine (as in Java or .NET)."  '923 patent at 4:12-15.  Telerik's construction spells out in simpler terms what a person of ordinary skill in the art would understand—in order for the recited tests to be run, the software application that is itself under test necessarily must also be running.  Orso Decl., ¶ 37.

Q.   "**at least one expectation is generating by recording an actual call**" ('923 patent, claim 24)

Claim 24 recites: "[a] system according to claim 18 wherein *at least one expectation is generating by recording an actual call* to at least said individual component."  The term means "using a call associated with normal operation of the production code to generate an expectation."

The specification discloses that "Natural Mocks use the actual calls to the methods that are to be mocked.  The Framework may be called by these calls (because all the methods are already weaved) and the framework may record that the call is expected, and add it to the list of expectations."  '923 patent at 6:65–7:2.  While "natural mock recorder 520" lacks sufficient description in the specification, Figure 7 and the associated explanation in the specification

24

demonstrates that, in the use-case of natural mocking, the mock framework 110 and natural mock recorder 520 receive a call that is associated with normal operation of the production code (106) in order to generate an expectation 710.  *See* '923 patent at FIG. 7; 7:21–42; *see also id.* at 7:43–45 ("When Natural Mocks are used, the arguments passed to the recording method are used to validate the arguments, unless explicitly overridden.").  Orso Decl., ¶ 38.  Telerik's construction reflects that understanding of the claim term, and would be helpful to the jury in explaining the scope of the claim.

R.  "**without dependency injection**" ('923 patent, claim 30)

Claim 30 of the '923 patent recites, in part, a "computational apparatus for testing the software application by removing or replacing a behavior of at least said at least partially isolated coupled software component during runtime, *without dependency injection*, wherein said apparatus for testing is operative to generate a plurality of expectations . . . ." (emphasis added). The term means "without relying on a provider of some capability or resource being inserted."

"Dependency objection" is unequivocally defined in the specification.  In describing the invention, the Applicant specifically disclaimed any "conventional" definition of the term "dependency injection" and instead substituted its own definition.  '923 patent at 1:24–31.  Thus, the specification notes that while "[c]onventional [i]nternet sources" may describe "dependency injection" one way, the Applicant was careful to point out that "[t]he term 'Dependency injection' is a misnomer, since it is not a dependency that is injected, rather it is a provider of some capability or resource that is injected."  *Id.*  Telerik's construction mirrors this language, explaining that the claimed requirement of "without dependency injection" requires "without relying on a provider of some capability or resources being inserted."  Orso Decl., ¶ 39.

## IV.     CONCLUSION

Telerik respectfully requests that the Court adopt findings that certain claim terms, as set forth above, are indefinite.   Further, Telerik requests that the court adopt its proposed claim constructions.

Dated: April 20, 2018

Respectfully submitted,

*/s/ James R. Anderson*

Steven M. Bauer (BBO # 542531)
James R. Anderson (BBO # 693781)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
(617) 526-9600 *telephone*
(617) 526-9899 *facsimile*
sbauer@proskauer.com
jaanderson@proskauer.com

Attorneys for Telerik, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic filing on

April 20, 2018.

*/s/ James R. Anderson*

James R. Anderson