**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| TYPEMOCK, LTD., <br><br>            Plaintiff, <br><br>    v. <br><br> TELERIK INC., <br><br>            Defendant. | Case No.: 1:17-cv-10274-RGS <br><br><br> JURY TRIAL DEMANDED |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION...............................................................................................1

BACKGROUND ................................................................................................3

   1.    Technological Overview ...........................................................................3

LEGAL PRINCIPLES ........................................................................................7

DISPUTED CONSTRUCTIONS .........................................................................8

   1.    The "software component[s]" term ...........................................................8

      A.   *The '923 Patent - "software components," Claims 1 and 30* ..........................9

      B.   *The '041 Patent - "software component," Claims 1 and 9*............................11

   2.    The "introducing [] prior to execution" term ........................................12

      A.   *The '923 Patent - "introducing, prior to execution," Claims 1 and 30*..........12

      B.   *The '041 Patent - "introducing, prior to execution of the software application," Claim 1, and "introducing into the software application, prior to execution of the software application," Claim 9*.......................................14

   3.    The "impos[ing] a fake behavior" term...............................................15

      A.   *The '923 Patent - "imposing a fake behavior," Claim 1, and "impose a fake behavior," Claim 30* ......................................................15

      B.   *The '041 Patent - "imposing a fake behavior," Claims 1 and 9*....................16

   4.    "during runtime" ('923 Patent, Claims 1, 30; '923 Patent, Claims 1, 9) ...........17

   5.    "at least one expectation is generating by recording an actual call" ('923 Patent, Claim 24)......................................................................18

   6.    "without dependency injection" ('923 Patent, Claim 30)...................................20

   7.    "said set" ('923 Patent, Claim 4)........................................................23

   8.    "first processor" ('041 Patent, Claim 1)...............................................25

   9.    "One or more second processors" ('041 Patent, Claim 1) .................................25

CONCLUSION ................................................................................................25

## TABLE OF AUTHORITIES

**PAGE(S)**

### Cases

*Energizer Holdings v. International Trade Com'n*, 435 F.3d 1366 (Fed. Cir. 2006) .............23

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, F.3d 1298 (Fed. Cir. 2003) ..........................8, 11, 13

*Innova/Pure Water v. Safari Water Filtration*, 381 F.3d 1111 (Fed. Cir. 2004).......................9

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ..................................................7

*Oatey Co. v. IPS Corp.*, 514 F.3d 1271 (Fed. Cir. 2008)................................................ *passim*

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...........................................7

*Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) ...........16, 24

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)*.......................................8

## INTRODUCTION

U.S. Patent Nos. 8,352,923 (the "'923 Patent") and 9,251,041 (the "'041 Patent") to Eli Lopian (collectively, the "Asserted Patents"), disclose and claim systems and methods that allow programmers to more easily isolate portions of a software application to assist in finding errors in that software application. The '923 Patent is the parent of the '041 Patent (*i.e.*, the latter was based on the former). The two patents share a common disclosure, but differ in their claims.

Typemock, Ltd. ("Typemock") holds full title to the Asserted Patents and accuses Defendant Telerik Inc. ("Telerik") of infringing claims 4, 9, 11, 14, 24, 25, 26, 28, 34, 39, 41, 44, and 48 of the '923 Patent, and claims 4 and 16 of the '041 Patent (collectively, the "Asserted Claims").

The parties have narrowed their disagreements as to the meaning of the claim language to the specific issues addressed herein (the "Disputed Terms").[1]

At a high level, the Asserted Patents concern the process of validating (testing) computer software. Software often exists as "applications" designed to perform specified tasks. A software application is in turn composed of many individual software components that rely upon each other to perform specific functions, much like the gears in a watch. When an application fails to perform as desired, such failure generally arises from defects in one or more underlying software components, or from some misfit among the individual components, just as a watch may fail if a gear is missing a tooth (individual component failure), or where the gears become misaligned (where the defect lies in the combination rather than in any individual gear).

---

[1] In addition, Telerik has indicated that it may challenge a number of terms in the Asserted Claims as being indefinite "means plus function" claims under 35 U.S.C. § 112, sixth paragraph, despite their undisputed meaning on their face when read from the perspective of a person of ordinary skill in the art. If and when Telerik makes such indefiniteness arguments in its opening brief, Typemock will respond thereto in its reply brief.

Techniques for software testing to some extent mirror the concerns in a mechanical system, and include (i) testing that each individual software component (unit) functions as intended ("unit testing") and (ii) testing that the individual units work together properly, and without giving rise to problems that result from their combination ("integration testing"). Because of the interrelated nature of the software components, integration testing of an entire assembly creates the problem of identifying where an error arose. For that reason, it is also desirable (and often critical) to be able to conduct unit testing. But unit testing requires the ability to isolate units to test them individually.

To some extent, unit testing can be performed on each unit before the software components are combined. But whenever the units require more than one complex form of input, programmers must inevitably test already constructed systems in order to have all the requisite inputs for the constituent software units. Since software components in an assembly often depend on the operation of other components, it can be very difficult to decouple them to ascertain that the individual components perform with realistic inputs.

A problem arises when the interrelated components of a software assembly cannot cleanly be pulled apart – which is often the case where the component depended on will not properly run when separated out (imagine pulling gears physically out of a clock), where complex external inputs are needed, or external side-effects are generated by running these components for testing. In general, a problem exists when a component to be tested requires test inputs that cannot readily be reproduced outside of the assembled software system.

The Asserted Patents (entitled "Method and system for isolating software components") addresses the problem of isolating software components for testing, by techniques that go beyond the prior art methods of simply trying to extract and run the components separately. The '923

2

Patent discloses a number of new methods of going behind the scenes while a program is executing, to introduce faked inputs that would have come from coupled components, but to do so at a lower level of assembly – outside of the regular program code flow – to achieve the effects of isolation.

Telerik has specifically requested interpretation of the Disputed Terms. Typemock believes that the language of the claims is clear and that the Disputed Terms require no construction.

**BACKGROUND**

*1.     Technological Overview*

At a high level of abstraction, a computer is simply a device that inputs data (*e.g.*, from a keyboard, mouse, microphone, database, network, etc.), processes this data in some manner to generate output data (image information, sound information, database information, etc.), and then submits this output data to an output device (video monitor, speaker, printer, electronic storage medium, etc.). Internally, to perform this data processing task, a computer contains a one or more processors connected to input devices, output devices, and memory. The processor(s) perform(s) a series of logical steps as instructed by a program, which program is stored in the memory, to get input data from the input devices and provide the resultant output data to the output devices. The program includes internal data needed to perform the processing task (*e.g.*, conversion constants, etc.) and machine code. The machine code contains a series of detailed data processing instructions encoded in a manner that the processor understands. The processor's successive execution of the data processing instructions results in the desired processing of input and/or internal data into output data. The machine code is essentially unreadable to humans.

3

In most instances, to create an application, a programmer first creates source code, which is a set of instructions written in a language that humans can more easily understand (and write) but which, conversely, the processor cannot. Another program (called a "compiler") takes the source code and converts it to something that is closer to what the processor can understand. This step is called "compiling" the source code, and the output of this compiling step is distributed to end-users as an application that they can run on their respective computers. Sometimes, the source code is compiled all the way down into machine code that the processor can directly execute. Other times, the source code is compiled down into an intermediate code called "byte code." This byte code is not directly readable by the processor, but an intermediate compiler on the end-user machine, termed a "just-in-time compiler" ("JIT"), can quickly convert the byte code into machine code suitable for the processor. A benefit of using byte code is that programs can be distributed in a machine-independent format, permitting broad interoperability. That is, whereas machine code for a processor family can only run on processors within that family, byte code can run on any machine that has a suitable JIT installed.

Although a program takes the form of a long stream of instructions stored in memory, it has, in fact, an internal design logic. When creating a software application, developers seek to break the overall problem addressed into a series of smaller tasks. Each task, in turn, may include a series of sub-tasks and so on. Each task (or sub-task) will have its corresponding block of program code, called a "function." A section of code can "call" a function (the "calling code"), which means that the processor is instructed to run the function to complete the corresponding task. When called, a function performs its particular task and then returns execution back to the calling code.

4

Rather than thinking of an application as a series of functions that call each other, a modern type of development involves an "object-oriented" approach to designing software. This means that the problem is broken down not as a series of tasks, but instead as a series of interrelating "objects." Objects can be thought of as the "gears" in the watch analogy above. And just as a watch can have different types of gears, an application can have different "classes" of objects. For example, a game may have class of objects termed "dog," each object of which is "instantiated," or created in the memory, every time the game needs to display a dog. Objects may be built up from other objects. The "dog" object, for example, may include other classes of objects, such as a "tail" object, four "leg" objects, a "head" object, etc. Object classes contain "methods" that control what the respective object in that class does, and data that allows an individual object to "remember" its respective state. For example, the "dog" object class may have a "bark" method, which is a function common to all "dog" objects that causes an instantiated "dog" object to bark in the game, and is called using, for example, the terminology "dog.bark(LOUD, FAST)." The parentheticals (called "parameters") are data provided to the "bark" method to control what it does when performing the "bark" function. The "dog" object could modify its internal data to reflect the LOUD and FAST parameters and subsequently "remember" to bark loud and fast. Sub-objects within an object can be called by successively chaining together the sub-objects and methods, the syntax of which contains successive periods. The dog's tail could be controlled with an underlying "wag" method, for example, with the following instruction: "dog.tail.wag(FAST)."

Debugging software often involves testing how one or more software components (such as functions or objects) behave when interacting with other software components. To do so, one or more components may be put into a known state, and then the application is run to see how

5

the other components behave under this known state. Placing components into a known state, however, may not always be easy. The components themselves may have a great deal of internal complexity and reliance on other components, or the programmer may simply not have reasonable access to a component to place it into a known state. For example, the Asserted Patents discuss testing the unusual date condition of February 29. *See* '923 Patent, 1:51-65. To do so, the system date of the computer could be changed, but this may not always be possible or desirable to do (as it could adversely affect other programs running on the computer, or the programmer may not have the requisite permissions).

Hence, for testing purposes, it is better to replace a "real" component with a "mock" (or fake) component. For example, the "dog" object discussed above may be quite complex and be strongly interrelated with other objects in the game. Rather than placing a "dog" object into a known state and hoping that it stays that way when testing the game, the "dog" object could instead be isolated, with a "mock" object put in its place. The rest of the game does not know about this mock object, but treats it as a real "dog," and the programmer can easily control the mock dog to see how its various states affect the rest of the game when debugging.

As explained in the '923 Patent, however, some software objects cannot readily be mocked by a simple attempt to replicate them in a mock object. The Asserted Patents set forth methods and systems that overcome such difficulties and permit isolating and mocking software components in a flexible manner that is agnostic to the design or functioning of the code being tested.

## LEGAL PRINCIPLES

Construction of patent claims is a matter of law for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). This is true even where the construction issues have evidentiary underpinnings in which the Court must make factual determinations. *Id.* at 390.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (internal quotations omitted).

In construing a term, the "objective baseline" is the "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312-13. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification" and the prosecution history. *Id.* at 1313.

"[T]he best source for understanding a technical term" is a patent's intrinsic evidence, which includes the patent and its prosecution history. *Id.* at 1315 (internal quotations omitted). The specification and the prosecution history "provide[] evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. However, because the prosecution history represents an "ongoing negotiation . . . rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Extrinsic evidence, such as expert and inventor testimony, dictionaries, treatises, and other evidence external to the patent and prosecution history may also be considered in claim construction. *Id.* Extrinsic evidence, however is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal quotations omitted).

A court may rely on extrinsic evidence "in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996).

A further relevant canon of construction concerns whether a claim can be interpreted in a manner that would exclude from its scope the preferred embodiment of an invention as described in the specification. The applicable rule in this regard is that "a claim construction that excludes a preferred embodiment . . . is rarely, if ever correct and would require highly persuasive evidentiary support." *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) (*quoting Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003)); *Vitronics*, 90 F.3d at 1583. Indeed, absent clear disclaimer in the specification or prosecution history, it is improper to "interpret claim terms in a way that excludes embodiments disclosed in the specification." *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008).

## DISPUTED CONSTRUCTIONS

### 1.    The "software component[s]" term

Telerik seeks construction of the plural term "software components" with respect to the '923 Patent, while seeking construction of the singular term "software component" for the '041 Patent. Although these terms obviously share the same root, they are, in fact, different claim terms and thus must be considered separately within the broader context of their respective claims. Nonetheless, the analysis for these two terms is consistent across the Patent-in-Issue.

8

A.      The '923 Patent - "software components," Claims 1 and 30

| Telerik's Proposed Construction | Typemock's Proposed Construction |
|---|---|
| "discrete portions of the production code capable of being isolated and changed" | Plain and ordinary meaning, *e.g.*, two or more parts or elements of software |

The plain and ordinary meaning of the term "software components" is simply two or more components of software, as made clear by the preceding "plurality of." "Component" has its conventional meaning, being a "part or element of a larger whole." *See, e.g.*, Oxford Living Dictionary, Component, *available at* https://en.oxforddictionaries.com/definition/component. Nothing in the specification or claims requires an interpretation other than the plain and ordinary meaning of this term, or importing a further limitation that the "components" must also be "discrete portions of the production code" or that they all be capable of "being isolated and changed" – indeed both of these proposed additional limitations are contrary to the disclosure of the patent.

The term "software components" first appears in the preambles of claims 1 and 30, which both recite a "software testing system operative to test a software application *comprising a plurality of software components* . . . ." '923 Patent, 13:56-57 (emphasis added).[2] A distinct, *singular* form, "software component," then appears in the body of claims 1 and 30. But none of the instances of these terms requires a construction that deviates from plain and ordinary meaning.

---

[2] Because the "claim construction analysis must begin and remain centered on the claim language itself," the analysis should initially consider how the term "software components," and its singular term "software component," appear in the claim language. *See Innova/Pure Water v. Safari Water Filtration*, 381 F.3d 1111, 116 (Fed. Cir. 2004).

9

The singular term "software component" is found within the bodies of claims 1 and 30, in connection with a "computational apparatus for at least partially isolating . . . at least one *coupled software component*." However, the plain language of the claims does not require that this individual "coupled software component" is one of the "plurality of software components" recited in the preamble. The recitation in the body does not, for example, refer back to the preamble for antecedent basis with the use of a definite pronoun (the, said). Rather, the bodies of each claim instead more generically refer to "at least one coupled software component." The Court should therefore be careful to distinguish the "plurality of software components" term of the preambles from the "coupled software component" recited in the respective bodies of the claims. Insofar as Telerik wishes to construe the term "software components," which is found only in the claim preambles, rather than the "coupled software component" (singular) recited in each claim body, and as nothing in the preambles of either of claim 1 or 30 suggests anything other than a plain and ordinary understanding of the term "software components," the Court should not limit (or even define) this term but instead afford it its plain and ordinary meaning.

Another significant problem with Telerik's proposed construction is that it requires "software components" to be "capable of being isolated and changed," when the specification clearly discloses embodiments that *do not change the production code*. There is no reason to import into the language of the claims a limitation that is directly refuted by an embodiment in the specification. According to the specification, "[a]nother method to isolate code and to insert fake objects is by changing the metadata tables" associated with the software application. '923 Patent, 5:33-34. Such an embodiment for isolating the coupled software component "has the advantage of being less intrusive as it **does not change the production code**, but only the metadata tables. This is useful in cases where the Run time system 102 **has restrictions on the**

**code being inserted**." *Id.*, 5:44-47 (emphasis added). By reciting "discrete portions of the production code capable of being isolated and changed," Telerik's proposed construction is unduly narrowing, fails to read on such disclosed embodiments and thus would require highly persuasive evidentiary support, which is lacking. *Epos Techs.*, 766 F.3d at 1347; *Oatey*, 514 F.3d at 1276.

Finally, Telerik's proposed construction recites "discrete portions of the production code," but the term "production code" is found nowhere in the claims and thus introduces ambiguity. Additionally, it is entirely unclear what the limitation "discrete" is intended to mean, as, again, this term is found nowhere in the claims, or even within the specification.

In view of the above, the Court should give the term "software components" its plain and ordinary meaning, *e.g.*, two or more parts or elements of software.

B.    The '041 Patent - "software component," Claims 1 and 9

| Telerik's Proposed Construction | Typemock's Proposed Construction |
| --- | --- |
| "discrete portion of the production code capable of being isolated and changed" | Plain and ordinary meaning, *e.g.*, a part or element of software |

Just as with the '923 Patent, the respective preambles of claims 1 and 9 of the '041 Patent begin by reciting a system for testing a software application "comprising a plurality of software components, at least some of which are coupled," and only later in their bodies do these claims then describe isolating "at least one coupled software component which performs a given function . . . ." '041 Patent, 13:34-43; 14:25-40. As described above, however, the specification of the '041 Patent, sharing the same disclosure as that of the '923 Patent, clearly sets forth embodiments in which the production code *is not changed*, but instead only metadata tables. *See* '041 Patent, 5:24-38.

11

Since no "highly persuasive evidentiary support" is present in the claims or specification of the '041 Patent for reading out disclosed embodiments from all of the claims, the Court should not adopt Tererik's construction but instead simply give the term "software component" its plain and ordinary meaning, *e.g.*, a part or element of software. *See Oatey*, 514 F.3d at 1276.

## 2. The "introducing [] prior to execution" term

Telerik seeks construction of the term "introducing, prior to execution" that is found in claims 1 and 30 of the '923 Patent. With respect to the '041 Patent, Telerik seeks construction of the term "introducing, prior to execution of the software application" found in claim 1, and the different term "introducing into the software application, prior to execution of the software application," found in claim 9. Despite being different terms (which are otherwise clear from their respective contexts), Telerik ascribes the same meaning to each of them, in direct opposition to the common specification of the Asserted Patents. The Court should instead simply give each of these terms its plain and ordinary meaning.

### A. The '923 Patent - "introducing, prior to execution," Claims 1 and 30

| Telerik's Proposed Construction | Typemock's Proposed Construction |
| --- | --- |
| "inserting into production code, before the software application is run" | Plain and ordinary meaning |

The term "introducing, prior to execution" is found within the body of claims 1 and 30 in connection with the "computational apparatus for at least partially isolating," in which this isolation function is done "by introducing, prior to execution, code elements for runtime access . . ." In this context, the term "introducing, prior to execution" is clear and should simply be given its plain and ordinary meaning: "introducing, prior to execution" (*i.e.*, before the coupled software component is run) – and not limited to "inserting into production code."

12

Telerik's proposed construction would insert the term "production code," which is found nowhere in the claims, and thus creates ambiguity where none existed. Moreover, inserting this further limitation would be contrary to the disclosure itself, which explicitly states that "[c]ertain embodiments of the present invention disclose a method that enables isolating software components, **without changing the production code**." '923 Patent, 1:46-48 (emphasis added).

The specification does state that "[t]he weaver 104 is responsible for inserting the added hooking code into the production code base 106." *Id.*, 4:15-17. However, this is only one example for isolating the "at least one coupled software component." According to the specification, "[a]nother method to isolate code and to insert fake objects is by changing the metadata tables" associated with the software application. *Id.*, 5:33-34. Such an embodiment for isolating the coupled software component "has the advantage of being less intrusive as it **does not change the production code**, but only the metadata tables. This is useful in cases where the Run time system 102 **has restrictions on the code being inserted**." *Id.*, 5:44-47 (emphasis added). The plain and ordinary meaning of "introducing, prior to execution" covers both embodiments, whereas Telerik's proposed construction would not.

As Telerik's proposed construction fails to read on the disclosed embodiments, it would require "highly persuasive evidentiary support," which is lacking, and thus must be incorrect. *Epos Techs.*, 766 F.3d at 1347; *Oatey*, 514 F.3d at 1276. The Court should instead give this term its plain and ordinary meaning.

13

B.      The '041 Patent - *"introducing, prior to execution of the software application,"*
*Claim 1, and "introducing into the software application, prior to execution of the*
*software application," Claim 9*

| Telerik's Proposed Construction | Typemock's Proposed Construction |
|---|---|
| "inserting into production code, before the software application is run" [Claim 1]<br><br>"inserting into production code, before the software application is run" [Claim 9] | Plain and ordinary meaning<br><br>Plain and ordinary meaning |

Telerik's construction, which seeks to conflate the plain and ordinary meaning of two, different, terms into a single construction, is wrong on its face. In addition to the problems with Telerik's proposed construction discussed above with reference to the '923 Patent, Telerik seeks to equate the term "**introducing**, prior to execution" of claim 1 with the term "**introducing into the software application**, prior to execution" of claim 9, thereby improperly reading features of claim 9 into claim 1. That is, despite being different terms, Telerik would ascribe the same scope to them, and in so doing would read out certain embodiments of the invention that *do not change the production code*. *See* Section 2(A) above. Telerik's single proposed construction for these terms must therefore be incorrect, and the Court should instead simply give these terms their plain and ordinary meaning.

14

### 3.    The "impos[ing] a fake behavior" term

A.    The '923 Patent - "imposing a fake behavior," Claim 1, and "impose a fake behavior," Claim 30

| Telerik's Proposed Construction | Typemock's Proposed Construction |
|---|---|
| "causing, during runtime, a change from the normal operation of at least one software component" [Claim 1]<br><br>"cause, during runtime, a change from the normal operation of at least one software component" [Claim 30] | Plain and ordinary meaning, and includes removing or replacing an expected behavior of the at least one coupled software component during runtime. |

The plain language of claim 1 itself defines what "imposing a fake behavior" means, stating that "imposing includes removing or replacing an expected behavior of the at least one coupled software component during runtime." The term "imposing a fake behavior" should thus be read in the context of the literal claim language and given its plain and ordinary meaning.

From a purely grammatical analysis, the object of the term "imposing a fake behavior" is "the at least one coupled software component." Telerik's proposed construction is flawed, however, as it improperly construes the object as being "at least one software component" - that is, not a definite "*the* at least one coupled software component," as recited in claim 1 but instead seemingly an indefinite *any* "at least one software component."

More problematic than this, however, is that Telerik's construction muddies the claim language rather than clarifying it. Telerik would inject the term "normal operation" into the language of claim 1, although this term is found nowhere else in the claim, or, indeed, within the specification of the patent. It thus begs the question of what is the "normal operation" of the "at least one software component"?

15

The confusion injected by Telerik's proposed construction is evident simply by making, into claim 1, the requisite substitution: "computational apparatus for testing the software application by **[causing, during runtime, a change from the normal operation of at least one software component]** on the at least one coupled software component, wherein imposing includes removing or replacing an expected behavior of the at least one coupled software component during runtime . . . ." There is confusion with the pre-existing and substitute language, and conflict between the language. The original language of the claim, however, is clear.

The Federal Circuit has stated that, "[t]he fact that we must look to other claims using the same term when interpreting a term in an asserted claim mandates that the term be interpreted consistently in all claims." *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995). The term "fake behavior," with respect to claim 30, should be interpreted consistently with the meaning construed in claim 1 and should therefore be given its plain and ordinary meaning of "including removing or replacing a behavior of the individual component," consistent with both the internal logic of claim 30 and the specification.

B.      The '041 Patent - "imposing a fake behavior," Claims 1 and 9

| Telerik's Proposed Construction | Typemock's Proposed Construction |
|---|---|
| "causing, during runtime, a change from the normal operation of the production code" [Claims 1, 9] | Plain and ordinary meaning, and includes removing or replacing an expected behavior of the at least one coupled software component during runtime. |

As with the '923 Patent discussed above, the plain language of claims 1 and 9 defines what "imposing a fake behavior" means, stating that "imposing behavior includes removing or

16

replacing an expected behavior of the at least one coupled software component, during runtime . . . ." '041 Patent, 13:52-56, 14:51-53. Telerik's proposed construction does not clarify the claim language, which is already clear. To the contrary, Telerik's proposed construction begs the question of what "normal behavior" is of "production code" when being tested, and injects additional confusion by stating that "imposing a fake behavior" means "causing . . . a change from the normal operation *of the production code*," rather than to "the at least one coupled software component," as explicitly recited in the claims. In other words, once again Telerik would limit testing procedures provided by the "imposing a fake behavior" feature to the "production code" specifically, rather than to a "coupled software component" generally. Telerik's proposed construction is thus unduly limiting, reading out disclosed embodiments that would otherwise be covered by the claims, and must be incorrect. *Oatey*, 514 F.3d at 1276. The Court should simply afford this term its plain and ordinary meaning.

4.    *"during runtime" ('923 Patent, Claims 1, 30; '923 Patent, Claims 1, 9)*

| Telerik's Proposed Construction | Typemock's Proposed Construction |
| --- | --- |
| "while the software application is running" | Plain and ordinary meaning |

A software application is a collection of data and code (byte code or machine code) that, when executed, causes a computer processor to perform various data processing steps. An application is "running" during the period when the processor is executing the underlying code of the application. *See* MICROSOFT PRESS, COMPUTER DICTIONARY 416 (3d ed. 1997) (Abramson Decl. Ex. 1) ("run" means "[t]o execute a program."). However, in a multitasking system, a single processor may only be able to "run" one application at a time. Each application is given a

17

slice of time during which its underlying code is executed. When that time is up, the processor jumps to another application and begins executing its underlying code. These jumps happen so quickly that all applications appear to be "running" at the same time, but they are not. They run *seriatim*, or simultaneously only to the extent that there are multiple processors running simultaneously as well, which is not always the case.

It is for this reason that "run time" means "[t]he time period during which a program is running," *i.e.*, after the software application starts and before it has completed. *Id.*

Telerik's interpretation of "during runtime" is flawed because the construction "while the software application is running" explicitly ties "running" of the application to the time period *during which* the application runs, which, as discussed above, is not always the same thing. That is, due to multitasking by the processor, an application may not always be running during the period of time that spans after the application has started and before it has finished. Rather, the application will be "running" in discontinuous, discrete time slices over this time period.

The Court should thus interpret "during runtime" to have its plain and ordinary meaning, such as "the time after the software application starts and before it has completed."

5.    *"at least one expectation is generating by recording an actual call" ('923 Patent, Claim 24)*

| Telerik's Proposed Construction | Typemock's Proposed Construction |
|---|---|
| "using a call associated with normal operation of the production code to generate an expectation" | Plain and ordinary meaning |

Claim 24 depends from claim 18 and recites that "at least one expectation is generating by recording an actual call to at least said individual component." The term "said individual component" finds its antecedent basis in claim 18, which recites "an individual component from

18

among the plurality of software components," referring, in turn, to the plurality of software components of the software application being tested.

The specification explains that, "[i]n each method of the production code the weaver 104 may insert a small piece of code 107 that calls the Mock framework 110 which then decides whether to call the original code or to fake the call." '923 Patent, 4:17-20. It is the "mock framework 110 [that] is responsible for creating mock objects dynamically and for managing the expectations and behavior of all fake calls." *Id.*, 4:29-31. According to the specification, there are "[t]wo ways to set expectations, namely by the use of Reflective mocks or Natural Mocks," of which Natural Mocks are relevant to claim 24. *Id.*, 6:40-41. "Natural Mocks use the actual calls to the methods that are to be mocked." *Id.*, 6:65-66. Further, "[w]hen Natural Mocks are used the Run Time Engine 510 passes each call to the Natural Mock Recorder." *Id.*, 8:2-3.

Accordingly, the term "at least one expectation is generating by recording an actual call," should simply be given its plain and ordinary meaning, *i.e.*, that the "at least one expectation is generated by recording an actual call."

Telerik's proposed construction introduces confusion into the plain language of claim 24, stating that "a call *associated with **normal** operation* of the production code" is used to generate an expectation. Telerik's proposed construction would require yet further interpretation to determine exactly what "associated with normal operation" means. Beyond the vagaries of the term "associated with," what exactly is meant by "normal operations" when a program is being tested and debugged?

If "normal operations" means an expectation that would be generated if no testing were being performed, then the construction is simply wrong, as the specification makes clear that "[c]hained calls are also supported using Natural Mocks. This allows a chain of calls to be

19

mocked in one statement. The [Mock] Framework may build the return object of one statement in the chain as an input for the next statement in the chain." *Id.*, 7:3-7. Since individual calls in this chain may *also* be mocked, there is no reason to believe, or require, that the resultant output expectation would be identical as when no testing is performed. Indeed, it seems quite likely that it may be different. Telerik's proposed construction, however, would read out all such embodiments and must therefore be incorrect. *Oatey*, 514 F.3d at 1276.

The Court should therefore construe this term as having its plain and ordinary meaning of "at least one expectation is generated by recording an actual call."

**6.    *"without dependency injection"* ('923 Patent, Claim 30)**

| Telerik's Proposed Construction | Typemock's Proposed Construction |
|---|---|
| "without relying on a provider of some capability or resource being inserted" | Plain and ordinary meaning, *e.g.*, without removing dependency from code under test and injecting it as input instead |

According to the Background section of the specification:

> Conventional Internet sources state that "Dependency Injection describes the situation where one object uses a second object to provide a particular capacity. For example, being passed a database connection as an argument to the constructor instead of creating one internally. The term [']Dependency injection['] is a misnomer, since it is not a dependency that is injected, rather it is a provider of some capability or resource that is injected."

'923 Patent, 1:24-31. In other words, the specification is quoting an Internet source that is describing "dependency injection" as a misnomer. More relevant to construing the instant term, however, the specification goes on to explain that:

> Certain embodiments of the present invention disclose a method that enables isolating software components, without changing the production code. Testing isolated software components gives better testing results as the coverage of the tests is much higher and the complexity does not grow exponentially. This is a basic requirement for validating a software component. In order to isolate the components, there is a need to design the

20

> program that utilizes the software components in such a way that the components can be changed. This is part of a pattern called Inversion of Control or **Dependency Injection**.

'923 Patent, 1:46-56 (emphasis added). In other words, according to the specification, and as is well known in the art, "dependency injection" is an inversion of control programming technique when designing software. For example, a Wikipedia article on "Dependency Injection" in June 20, 2007, explained:

> The technique [of dependency injection] results in highly testable objects, particularly when applying test-driven development using mock objects: Avoiding dependencies on the implementations of collaborating classes (by depending only on interfaces that those classes adhere to) makes it possible to produce controlled unit tests that focus on exercising the behavior of, and only of, the class under test. To achieve this, dependency injection is used to cause instances of the class under test *to interact with mock collaborating objects*, whereas, in production, dependency injection is used to set up associations with bona fide collaborating objects.

https://en.wikipedia.org/w/index.php?title=Dependency_injection&diff=prev&oldid=141213974 (emphasis added).

While dependency injection can thus often be used as a code design (or re-design) technique to allow unit testing, the specification then provides various examples where the dependency injection technique may not be practical, such as changing the system date function ('923 Patent, 1:56-60), faking a behavior that is scarce, such as dates and out of memory conditions (*id.*, 2:1); faking slow running components, such as a database or the Internet (*id.*, 2:2); faking components that are difficult to set up, such as file transfer protocol ("FTP") (*id.*, 2:3); faking a complete set of application programming interfaces ("APIs"), such as for the sending of email (*id.*, 2:5-21); and, significantly, legacy code "that was not designed to allow insertions of fake objects." *Id.*, 2:39-40.

The specification then goes on to state that, "[i]t would be easier to test such code if there were no need to change the design for testability, but it should be able to isolate and fake the

code required to validate such code," and follows this up with a specific embodiment for doing so. *Id.*, 2:50-64.

It is clear from the specification that the term "without dependency injection" means without removing a dependency from within the code under test and introducing it instead in through the call to the code, which is the understanding that a person of ordinary skill would have for this term.

The limitation in question is framed in the negative. Telerik's proposed construction seeks to unduly narrow this limitation by excessively *broadening* the negative limitation with the word "provider." Merely "providing" a capability or resource is a broader concept than introducing it through dependency injection. Thus, for example, if the resource is considered to have been "provided" (as set forth in connection with one embodiment described in the specification) as a result of modifying compiled byte code in the execution queue during runtime (as opposed to the normal process of fetching code from the instruction queue), this is not "dependency injection" as that term is understood by persons of skill in the art. In other words, Telerik's proposed interpretation could then be used to read out the majority of the disclosed embodiments, and make these claims meaningless.

Telerik has not disputed that dependency injection is well-understood by persons of skill in the art, and the Court should therefore give the term "without dependency injection" its plain and ordinary meaning to such persons.

22

7.    *"said set" ('923 Patent, Claim 4)*

| Telerik's Proposed Construction | Typemock's Proposed Construction |
| --- | --- |
| allegedly indefinite | the plurality of components that are 'coupled in a utilizing-utilized relationship' as recited in claim 1. |

Claim 4 recites "[a] system according to claim 1 wherein *said set* comprises at least one utilizing software component which accesses at least one data element belonging to its corresponding utilized software component." '923 Patent, 14:20-23. As noted by Telerik, the term "said set" lacks a formal grammatical antecedent basis, insofar as claim 1 does not refer in *haec verba* to "a set."

There is no *per se* rule, however, that failure of a precise antecedent basis renders a claim indefinite. "When the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'" *Energizer Holdings v. International Trade Com'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006). A person of ordinary skill would readily understand that the term "said set" refers to the set of components that are 'coupled in a utilizing-utilized relationship,' recited in claim 1.

First, claim 4 recites "at least one *utilizing software component*" as well as "at least one data element belonging to its *corresponding utilized software component*," which clearly refers to the "plurality of software components . . . coupled in a utilizing-utilized relationship," recited in claim 1. A "set" is "[a] group or collection of things that belong together or resemble one another or are usually found together." Oxford Living Dictionary, set, *available at* https://en.oxforddictionaries.com/definition/set. As a plurality of objects constitutes a "set" of

such objects, a person of ordinary skill would understand that the term "said set" refers to the plurality of software components 'coupled in a utilizing-utilized relationship' recited in claim 1.

Second, since the Court should "look to other claims using the same term when interpreting a term in an asserted claim," it is reasonable to look at other claims that use the term "set" to understand how it is used in these other claims. *Southwall Technologies*, 54 F.3d at 1579.

Claim 3 recites "[a] system according to claim 1 wherein *said set* comprises at least one utilizing software component which calls its corresponding utilized software component." Although this claim suffers from the same antecedent issue of claim 4, it is nonetheless consistent with the interpretation of "said set" recited in claim 4 as meaning the set of components that are 'coupled in a utilizing-utilized relationship' recited in claim 1.

Claim 9 is also consistent with this interpretation. Claim 9 depends from claim 1 and recites "the plurality of software components comprises a set of at least one pairs [sic] of utilizing-utilized software components each including a utilized software component and a utilizing software component which utilizes said utilized software component," consistent with, and confirming, the interpretation of "said set" of claim 4 as meaning the set of components that are 'coupled in a utilizing-utilized relationship' as recited in claim 1. *See* '923 Patent, 14:51-55.

The Court should thus find that claim 4 sufficiently points out the claimed subject matter under 35 U.S.C. § 112, with "said set" referring to the "plurality of software components, at least some of which are coupled in a utilizing-utilized relationship," and meaning "the plurality of software components that are 'coupled in a utilizing-utilized relationship' as recited in claim 1."

24

8. *"first processor"* (*'041 Patent, Claim 1*)

| Telerik's Proposed Construction | Typemock's Proposed Construction |
|---|---|
| "processor separate and distinct from the one or more second processors" | Typemock asserts plain an ordinary meaning but agrees with Telerik's proposed construction |

9. *"One or more second processors"* (*'041 Patent, Claim 1*)

| Telerik's Proposed Construction | Typemock's Proposed Construction |
|---|---|
| "one or more processors separate and distinct from the first processor" | Typemock asserts plain an ordinary meaning but agrees with Telerik's proposed construction |

**CONCLUSION**

For the forgoing reasons, the Court should construe each of the above-noted limitations to have its plain and ordinary meaning, which interpretation is consistent with the internal language of the claims themselves and the specification.

25

Dated: April 20, 2018

/s/ Ronald Abramson
Ronald Abramson (admitted pro hac vice)
(ronald.abramson@lbkmlaw.com)
David G. Liston (admitted pro hac vice)
(david.liston@lbkmlaw.com)
**LEWIS BAACH KAUFMANN MIDDLEMISS PLLC**
The Chrysler Building
405 Lexington Avenue, 62nd Floor
New York, New York 10174
Tel.: (212) 826-7001

Philip C. Swain
(pcs@foleyhoag.com)
**FOLEY HOAG LLP**
155 Seaport Boulevard
Boston, MA 02210-2600
Tel.: (617) 832-1000

Attorneys for Typemock, Ltd.

## CERTIFICATE OF SERVICE

On this 20th day of April, 2018, I certify that I caused a copy of Plaintiff Typemock,

Ltd.'s Opening Claim Construction Brief to be served upon the below-listed counsel of record

for Defendant via ECF and email.

Dated: April 20, 2018

*s/ Ronald Abramson*
Ronald Abramson

Steven M. Bauer
James R. Anderson
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
sbauer@proskauer.com
jaanderson@proskauer.com