**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| Typemock, LTD., <br><br> Plaintiff, <br><br> v. <br><br> Telerik, Inc., <br><br> Defendant. | Case No.: 1:17-cv-10274-RGS <br><br> **JURY TRIAL DEMANDED** |

**DEFENDANT TELERIK INC.'S REPLY CLAIM CONSTRUCTION BRIEF SHOWING
THAT THE ASSERTED PATENT CLAIMS ARE INVALID AS INDEFINITE**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012) ............................................................................................. 3

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ................................................................................. 1, 2, 3, 4

**TABLE OF CONTENTS**

I. INTRODUCTION .............................................................................................................. 1

II. ARGUMENT ..................................................................................................................... 1

    1. The Disputed Terms Use "Nonce" Words Without Corresponding Structure, and Therefore are Indefinite and Invalid, As A Matter of Law. ............................................. 1

        A. "computational apparatus . . . " ................................................................................ 1

        B. "a first processor functionally associated with a digital memory, which digital memory stores processor executable software testing code adapted to cause one or more second processors to" ............................................................................ 4

        C. "apparatus for adding access controlling code . . . " / "apparatus for modifying said meta-data . . ." ................................................................................................ 5

        D. "introducing, prior to execution, code elements for runtime access of application points" ........................................................................................................................ 6

        E. "access controlling code external of the software application for anticipating forthcoming utilization of utilized software components by utilizing software components for selectively preventing said utilization by controlling access of the utilizing software component to the utilized software component" .................. 7

        G. "computational apparatus for at least partially isolating" ........................................ 8

        H. "a plurality of software components, at least some of which are coupled in a utilizing-utilized relationship" .................................................................................. 8

        I. "a plurality of software components, at least some of which are coupled in a utilizing-utilized relationship" .................................................................................. 9

        J. "introducing, prior to execution, code elements for runtime access of application points" ........................................................................................................................ 9

        K. "an associated behavior inducing message" ............................................................ 10

        L. "wherein imposing includes removing or replacing an expected behavior of the at least one coupled software component during runtime" .............................. 10

III. CONCLUSION ................................................................................................................ 11

**I.     INTRODUCTION**

The Court's Scheduling Order required the parties to first, identify the claim terms for which they sought construction; second, "meet and confer" to see if there was any middle ground; and third, file two rounds of simultaneous briefs directed to the open issues. Telerik did just that. Typemock, however, chose to ignore the court's order and said nothing in its opening brief regarding the indefinite terms, choosing to wait until its second brief.

Because Telerik had no opportunity to reply to Typemock's arguments on the indefiniteness issues, this Court entered an order allowing Telerik to file this third brief, to respond to Typemock's arguments.

Having now seen Typemock's arguments in its second brief, Telerik can now say this: Typemock *still* fails to address the invalidity issue head on, instead misdirecting its argument and "evidence" to terms and constructs not in issue. The simple fact is this: the use of words like "apparatus," "computational apparatus," and "code elements" in the claims are precisely the use of nonce words, unconnected to structure, that renders the claims invalid. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015) ("Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112, ¶ 6.").

**II.    ARGUMENT**

      **1.     The Disputed Terms Use "Nonce" Words Without Corresponding Structure, and Therefore are Indefinite and Invalid, As A Matter of Law.**

          A.     *"computational apparatus . . . "*

Although Telerik contended that the term "computational apparatus" was indefinite and not amenable to construction, Typemock provided no definition for the term in its opening brief.

Now, in its reply brief, while still not providing any definition for the term, Typemock challenges the notion that the term "computational apparatus" is a nonce word making the term subject to a means-plus-function construction, but again, fails to provide any alternative definition.

Typemock, instead, argues that the term needs no construction, saying that the claim language itself defines the term. That is, Typemock contends that the term "*computational apparatus* for at least partially isolating" is defined by language appearing later in the claim, specifically, in the case of exemplary claim 1 of the '923 patent, the language:

> by introducing, prior to execution, code elements for runtime access of application points associated with the at least one coupled software component, wherein at least one code element associated with the at least one coupled software component provides access control between utilizing-utilized software components.

But, Typemock is advocating the most fundamental of errors, ignoring that the undefined term is "computational apparatus," and instead arguing that the *functional* language of what the "computational apparatus" *does*, is in fact the "structure" of the "computational apparatus" itself. Typemock's argument seems to be that the *claim* itself somehow provides sufficient structure for the "computational apparatus" because a person of ordinary skill in the art would "know how to program" a computer to perform the recited functions. It repeats this error for each instance of "computational apparatus."

The problem with Typemock's argument is that is *exactly* the argument that the Federal Circuit rejected in *Williamson*. "[T]he fact that one of skill in the art could program a computer to perform the recited functions cannot create structure where none otherwise is disclosed." 792 F.3d 1339, 1351.

Notably, the claims recite a number of different "computational apparatus[es]," each for carrying out different functions in the claim. For example, claims 1 and 30 of the '923 patent

2

have a "computational apparatus for at least partially isolating," and a separate "computational apparatus for testing."[1] Claim 9 of the '041 patent has a third "computational apparatus," namely one that performs *both* the functions of "at least partially isolating" and "testing."

The law regarding "means plus function" terms says that Typemock is only "entitled to 'corresponding structure . . . described in the specification and equivalents thereof, ***not any device capable of performing the function***." *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) (emphasis added).  It is for this reason that Typemock must "clearly link" *structure* corresponding to *each* "computational apparatus" to its corresponding *function*. *Williamson*, 792 F.3d at 1352.  That is, the law imposes on *Typemock* the burden of identifying structure disclosed in its patent that corresponds to, and is tied to, the functions recited for *each* "computational apparatus" in the claims.

Typemock argues, wrongly, that the *functional* description of what the "computational apparatus" does gives the claim its structure.  But Typemock's approach would read the term "computational apparatus" right out of the claim altogether.  Typemock does not point to specific "machines" that are "clearly linked" to *each* of the "computational apparatus[es]" in its brief. Even the Patent Examiner noted that "apparatus" is physical structure.  (Dkt. No. 60 ("Br.") at 10 ("[T]he Examiner noted that 'the "apparatus" is interpreted . . . as [prior art reference] Avakian's server (see paragraph [0054]), ***i.e. a "machine" as described on page 4 lines 25–26***.'").)

Typemock argues that "[b]ecause the claim relates to software (*see* Def.'s Br. 22), the corresponding structure is a computer programmed to implement an algorithm that performs the

---

[1] Typemock concedes in its brief that the "computational apparatus for testing" is separate: "Claim 1 further recites 'computational apparatus for testing the software application,' and thus the function of this *additional* 'computational apparatus' is 'testing the software application.'" (P. Reply at 11 (emphasis added).)

3

recited function."  (Dkt. No. 74 ("P. Reply") at 10.)  That argument is wrong for at least two reasons.  First, Typemock's contention that the *structure* is a computer programmed to implement an algorithm ignores the fact that the '923 patent claims *already* include a "processor."  And second, the "algorithms" Typemock points to in the specification are not algorithms at all, but merely *functional* description that fails to impart any *structure*.  That is, the two "algorithms" Typemock points to: "insert[ing] a small piece of code" and "changing the metadata tables," (*id.* at 11) are not algorithms telling *how* to do the function, but are merely functional disclosures.

> B.   ***"a first processor** functionally associated with a digital memory, which digital memory stores processor executable software testing code adapted to cause **one or more second processors** to"*

Similarly, the term "first processor" is indefinite, because "processor" is a nonce term without any corresponding structural disclosure in the specification.  The claim says that the *function* of the first processor is to "associate with a digital memory, which digital memory stores processor executable software testing code adapted to cause one or more second processors to" perform other functions recited in the claim.  (Br. at 11.)

Typemock does not tie the function of the "first processor" to any structure disclosed in the specification.  Typemock simply fails to point to anything in the specification describing any processor that "stores the code that drives the second processor" (which failure should be expected because it is in fact the "digital *memory*" that "stores processor executable code").  Typemock also fails to point to any code or algorithm for performing that function.

In fact, all Typemock points to is boilerplate language in the specification saying that "[a]ny suitable processor" would do.  (P. Reply at 12 (citing '041 patent at 2:57–3:23).)  But, the Federal Circuit "has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor."  *Williamson*, 792 F.3d at 1352.

4

"One or more second processors" is similarly indefinite, because although Typemock argues that the "one or more second processors" "perform[] the 'isolating' and 'testing' *functions*" (P. Reply at 12), it does not clearly link any processor in the specification to how they are specially programmed to perform the recited functions. (*See also* Br. at 11–12.)

        C.     "apparatus for adding access controlling code . . . " / "apparatus for modifying said meta-data . . ."

Claims 32 and 48 recite additional "apparatus[es]" for performing specified functions, again without explaining what those functions are. Those apparatuses, again pure nonce words, are limitations on the system recited in independent claim 30. And again, Typemock seeks to read those terms right out of the claims.

Typemock argues that the "apparatus for adding access controlling code" "refers to programmed computational apparatus (as in the parent claim)." (P. Reply at 13.) The *claim*, however, recites a *separate* "apparatus for adding access controlling code"—"said apparatus for at least partially isolating *comprises* apparatus for adding access controlling code between each pair of utilizing-utilized software components." '923 patent at claim 32. Thus, the "apparatus for adding access controlling code" is an undefined apparatus, separate from the "apparatus for at least partially isolating" recited in claim 32.

The error in Typemock's argument is apparent in its effort to find structure in the specification corresponding to the "apparatus for adding access controlling code." For example, Typemock points to "weaver 104" that "insert[s] a small piece of code 107 that calls the Mock framework 110 which then decides whether to call the original code or to fake the call" as algorithmic structural disclosure. (P. Reply at 13 (citing '923 patent at 4:15–20.) However, Typemock's discussion of the "computational apparatus for at least partially isolating" points to *the very same* passage in the specification as the algorithmic support for *that* term. (*Id.* at 11

5

(citing '923 patent at 4:18–20).) While the "apparatus for at least partially isolating comprises apparatus for adding access controlling code," the two are not one in the same.

Typemock's argument with respect to the "apparatus for modifying said meta-data" in claim 48 is even flimsier. There, Typemock argues that "claim 48 states that the 'apparatus for modifying' modifies the meta-data 'to point to access control code,' clearly specifying what *operation* it carries out." (Dkt. No. 74-1 at 15.) Yet, although the claim explains the *function* carried out by the "apparatus for modifying said meta-data," Typemock fails to point to anything in the patent that explains *what* the "apparatus for modifying said meta-data" actually is. And again, when Typemock refers to the specification to find "structure" for this "apparatus," it points to the same language it did for the "computational apparatus for at least partially isolating," discussing "changing the metadata tables." (*Compare* P. Reply at 14 (citing '923 patent at 5:33–34), *with id.* at 11 (citing '923 patent at 5:34).)

### D.     "introducing, prior to execution, **code elements for runtime access** of application points"

The claims recite "code elements" that perform different functions recited in the asserted independent claims of the '923 and '041 patents. Telerik proposed a construction that the code elements must perform the function of "runtime access." (Br. at 14 n.10.)[2] Typemock, however, does not show that the specification shows what a "code element" actually *is*, or *how* one is to provide "runtime access." The claim term is therefore indefinite.

Now, Typemock argues that "code elements" means *both* "elements of code," *and* "instructions and data (such as memory pointers) described by the patent specification, as

---

[2] *E.g.*, '923 patent, claim 1: "runtime access of application points associated with the at least one coupled software component, wherein at least one code element associated with the at least one coupled software component provides access control between utilizing-utilized software components"

6

discussed above, that are introduced into the software application in order to control access to software components." (P. Reply at 14.)[3] "Memory pointers," however, appears nowhere in the patent, and is not otherwise explained by Typemock.

And, Typemock again points to the same parts of the specification to support "code elements for runtime access" as it did for "computational apparatus" and the other "apparatus" terms in dependent claims 32 and 48 of the '923 patent. (P. Reply at 15.) A claim cannot be definite where the patentee needs to argue that the same "structure" is "clearly linked" to *several different* claim terms.

> E. *"access controlling code external of the software application for anticipating forthcoming utilization of utilized software components by utilizing software components for selectively preventing said utilization by controlling access of the utilizing software component to the utilized software component"*

This term requires means-plus-function treatment because it recites "code" which has the functions of "anticipating forthcoming utilization of utilized software components by utilizing software components" *and* "selectively preventing said utilization by controlling access of the software component to the utilized software component," without tying either of those functions to any structure. Again, Typemock ignores that "access controlling code" must itself have some

---

[3] Claims are to be construed as understood by one of ordinary skill. Telerik's expert proposed that that person of ordinary skill would have "a bachelor's degree in computer science, computer engineering, or the equivalent, and 1-3 years of industry experience, and/or an advanced degree in computer science or a related field." (Dkt. No. 61-3 ¶ 12.) Typemock, however, failed to disclose the level of ordinary skill that it was applying in *its* Opening Brief. In its opposition brief, for the first time, it contends that the level of ordinary skill is different—"a bachelor's degree in computer science from an accredited academic institution, or the equivalent, and 2-3 years of industry experience in systems-level programming." (P. Reply at 6.)

In any event, it is unclear why Typemock argues for a different standard, because Typemock fails to explain why applying its definition of the person of ordinary skill in the art over Telerik's would make any difference in understanding the claim language.

7

meaning to a person of ordinary skill in the art, so that the jury can evaluate whether "access controlling code" is present. Yet, instead of explaining what the "access controlling code" *is*, Typemock only points to description showing *function* in the claim and specification.

        G.      "*computational apparatus for* **at least partially isolating**"

The phrase "at least partially isolating" is made up of two different terms of degree, "at least" and "partially." Neither of those terms appear in the specification (outside of the abstract), and the specification does not explain the scope that the term encompasses.

Typemock's argument demonstrates that the "at least partially isolating" cannot be understood with reasonable certainty by a person of ordinary skill in the art. It argues that a software component being "fully isolated" is described in the patent as where the mock framework "decides whether to call the original code or to fake the call." (P. Reply at 20.) It then argues that a software component is *partially* isolated where "the Mock framework may selectively *decide at various times to call the original code or to fake the call*." (*Id.*) Under Typemock's interpretation, the term has no bounds at all.

        H.      "a plurality of software components, at least some of which are **coupled** in a utilizing-utilized relationship"

In the context of computer programming, two components being "coupled" refers to the "***manner and degree*** of interdependence" between the two components. (Br. at 18.) Because the term "coupled" is not explained in the specification, Telerik offered extrinsic evidence to show that "coupled" is an indefinite term of degree. Typemock made no effort to rebut that evidence in its brief. Its only response is the unsupported assertion that "[w]hether two software components are 'coupled' in this manner (as claimed) is a question of yes or no, and not a matter of degree." (P. Reply at 17.) Tellingly, *that* statement is mere lawyer argument, unsupported by Typemock's expert.

8

Typemock's new proposed construction—that the term "coupled" means "connected or associated" (*id.*), does not help it here.  Case law cannot define a term in the asserted patents, because any construction here must turn on the facts of this case.  But, more importantly, the cases Typemock cites in support of its proposal refer to *physical* systems electrically coupled to one another.  (*Id.* at 17 n.3, citing cases.)  In contrast, the claims here recite coupled "software components."  Typemock offers no explanation as to how one of ordinary skill would understand the term "coupled" with reference to software.

### I. "a plurality of software components, at least some of which are coupled in a **utilizing-utilized relationship**"

The terms "utilizing," "utilized," and "utilizing-utilized" are not terms of art and do not appear in the specification.  Typemock's only response is that the specification provides "examples" of software components that are in utilizing-utilized relationships, along with a blanket cite to two columns in the specification.  (*Id.* at 18.)  Yet, Typemock's expert provides only one "example."  (Dkt. No. 74-1 at 21.)  Typemock's assertion that examples of products in a utilizing-utilized relationship exist in the patent, does not explain to a person of ordinary skill in the art what the claim term means.  Indeed, Typemock does not even attempt to provide a meaning, arguing only that a person of ordinary skill in the art would understand the term to have its "ordinary meaning."

### J. "introducing, prior to execution, code elements for runtime access of **application points**"

Typemock now asserts that "application points" means "'points in the application,' a place in its code (or corresponding metadata pointing to a place in the code)."  (P. Reply at 18.)  Typemock's construction does not comport with the language of the claim itself.  The claims recite "introducing, prior to execution, code elements for *runtime access of **application points** associated with the at least one coupled software component*."  In other words, it is the "code

9

elements" that provide *access **to*** the "application points." Typemock's citation to "'[w]eaved code' 308 [which it would assert is a "code element"] being inserted at a specific place" does not explain what or where an "application point" actually is. (*Id.* at 19.)

### K.   "an associated behavior inducing message"

The "associated behavior inducing message" is something that is generated by the "apparatus for testing" and "induc[es] said apparatus for at least partially isolating." Those *separate* "computational apparatuses" are indefinite. Without sufficiently-bounded scope, it is hard to know where any "associated behavior inducing message" is coming from, or where it is "communicated" to. (*Id.*) Beyond that, Typemock offers no construction for what the claim term means, merely pointing to discussion in the specification of "Method Expectations." (*Id.*) That discussion describing an embodiment in the specification leaves undefined the term "associated behavior inducing message."

### L.   "wherein imposing includes removing or replacing an **expected behavior** of the at least one coupled software component during runtime"

In its brief, Typemock contends that "'expected behavior' means the behavior expected from the 'at least one coupled software component' from a call to that component that will occur during a test." (*Id.* at 20.) Typemock's discussion of "Expectation Manger 550" is misplaced, at least because that module "manage[s] the expectations for the fake code." ('923 patent at 6:4–5.) But, the claim language (and Typemock's understanding of it) shows that the recited "expected behavior" relates to the "at least one coupled software component," not "fake code." That leaves "expected behavior" without any support in the specification to guide the understanding of a person of ordinary skill in the art as to the scope of that claim term.

## III. CONCLUSION

For the foregoing reasons, Telerik respectfully requests that the Court find the asserted '923 and '041 patents invalid because the terms are indefinite.

Dated: May 30, 2018

Respectfully submitted,
*/s/ James R. Anderson*
Steven M. Bauer (BBO # 542531)
James R. Anderson (BBO # 693781)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
(617) 526-9600 *telephone*
(617) 526-9899 *facsimile*
sbauer@proskauer.com
jaanderson@proskauer.com

Attorneys for Telerik, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic filing on May 30, 2018.

                                                   */s/ James R. Anderson*
                                                   James R. Anderson